Good morning. Jesse McGowan, appearing on behalf of Ms. Lonnie Williams. This case, well, first of all, I'd like to begin by acknowledging that this case, there is some colorful statements made by my client in a lot of the filings made to this court and also the district court level. But my point, what I would like to impress upon this court is that this is the type of case that we really need to keep in mind where we are at in the litigation, that this is pre-trial. And so we have to resist any temptation to make a credibility determination this early in the case. We've all read many colorful statements from prisoners. OK. All right. So the two main issues, of course, in this case, the first one involves the imminent danger exception under 1915 G, which this court asked me to address, actually. And then the second issue is whether the district court erred on the merits in granting the defendant's motion for summary judgment. So I'd like to begin with the first issue, the imminent danger exception. Now, the key point I'd like to make about that issue today is the standard announced by this court in Williams 1, the prior appeal in this very same case. And in that opinion, the court adopted the standard from Andrews versus Cervantes, which was the standard that you basically have to just make a plausible allegation that you're under imminent danger to your physical safety. That's all the inmate has to do at the time. In Andrews, it's at the filing of the initial lawsuit. With Williams 1, they adopted that rule and said you have to make that allegation at the filing of the notice of appeal. So but the court in Williams 1 didn't just adopt that. It said a lot about the standard. And most importantly, the court said that there has to be a presumption that there's an ongoing danger. And of course, that's new law, because under Andrews, there was no prior opportunity to allege an inmate was in danger. And also, the court went on about how a detailed analysis of the factual allegations is not appropriate. The court called it an administrative inquiry. And there were all these good reasons for taking that kind of relaxed approach. I mean, we don't want to get into satellite litigation. We want to avoid constitutional problems, claims where an inmate is kept from accessing the federal courts, even though they might be in danger. What is, if any, the difference in the record between the facts at the time that Williams 1 found imminent danger and the facts currently before this court? Our position is that there's no material difference. Ms. Williams filed an opposition with the district court about two months before the filing of the second notice of appeal, which stated very similar allegations. Basically, that the prison officials from her first prison were spreading rumors about that she was a sexual offender. And then, Well, not only spreading rumors, but putting an R in her file. Correct. Correct. Certainly. He says it's erroneous. That was part of it. Yes. And that R presumably remains in the file, or they start over at a new institution, or how does that work? I don't think the record was developed. I don't think we know that. The defendants might be able to address that. But also, the key in the first decision in Williams 1 on that issue is that the court found that she met the exception, even though she was moved to a different prison after the fact, after filing the notice of appeal. And she sufficiently connected the dots. Did Judge Moskowitz and the district court then find imminent danger on remand? I don't think they even, the issue was not raised again. I don't think it came up. Can I, I'm sorry, did you have your question? No, I'm fine. Could I ask you, have you jump to exhaustion real quickly? Sure. I want to make sure I understand the relief you're seeking at this stage. The district court found, on summary judgment, that there wasn't a tribal issue of fact on whether your client had exhausted properly. If we were to agree with you that that was an error, what would the procedure be in the district court on this issue? Would the district court hold a factual hearing? Would they call witnesses? Would there be a trial on the issue of exhaustion? Can you explain to me what the relief is you're seeking on the exhaustion issue? Well, I think it would depend on, I think the relief would be similar to in Williams 1, how they remanded the case. And the district court, in that case, issued an order to show cause and gave the defendants another opportunity to file a summary judgment motion and move again on the issue of exhaustion. So they did have two bites of the apple in this case. No, I understand that. But let's say, for example, as I understand how the issue is framed right now, we have your client saying, hey, I made a proper grievance. I gave it to Officer Cobb. And Officer Cobb says, you know what? I don't remember this one. But I can generally say what our procedures were at the time. I think I'm summarizing the record correctly. OK. So let's say we agree with you that it was wrong for the district court to enter summary judgment for the defendants at this stage because Officer Cobb has not been cross-examined. There are factual issues in dispute. Both sides have a plausible story pointing out each other. So it goes back to the district court. What happens next? Does the district court have a trial? Does it have a hearing? Are witnesses called? What do you want the district court to do if we agree with you that summary judgment was inappropriate at this stage? I think set it for trial, unless there's some other motion by defendants, some other way that they're trying to dispose of the lawsuit in a different manner. I think what Judge Owens is asking is how would the issue of exhaustion be decided, not how would the merits be decided. And what I would ask to be more specific is could this court not simply say yes, based on this record, essentially summary judgment for the plaintiff on exhaustion. This court, perhaps, you would say, could find that there was sufficient exhaustion. Alternatively, yes. Would it not have to be an evidentiary hearing where Officer Cobb would come and say, yeah, I still don't remember. And Ms. Williams would come and say, yeah, I gave it to him. And the district court would have to make that determination. Yes. Or I suppose it could go to the jury along with the merits. I think that it would be appropriate. And if I recall. I gave three options. OK, the option number one, the option where the court grants summary judgment in our favor on the issue of exhaustion. OK, obviously that's the best for you. But if we don't agree with you that far, then I assume it would be a form of, I'll call it B or C, is what you're looking for. Right. I mean, at the end of the day, there's probably not that much more you could flesh out on this issue factually. I mean, Mr. Cobb will say what he's going to say in his declaration. And that's not sufficient. It's not sufficient. So I think eventually the issue of exhaustion, I mean, both sides have to move on. Do you want to reserve your time for rebuttal? I will, yes. Thank you. Good morning, Your Honors, and may it please the court. I'm Suzanne Antley, and I represent the appellees in this case. We're asking the court to do two things today. First, we're asking you to revoke Ms. Williams' unlawful and impoperous status. Could you speak a little closer to the microphone, both for me and perhaps for Judge O'Scannell? Or just move it closer to you. Just pull the thing. Is that better? Much better. OK. That's better. Thank you. We're asking you, first, to revoke Ms. Williams' informed impoperous status and require her to pay the court's filing fee. And second, we're asking you to affirm the summary judgment for the defendants. The court should revoke Ms. Williams' IFP status because she didn't satisfy the criteria that this court established for applying the imminent danger exception to the three strikes statute. Could I ask you the same question? What's the difference in the record with respect to that issue between what the Williams 1 court ruled on and what's before this court at this time? The Williams 1 court said, what we should do is look at the allegations of imminent danger that are made at the outset of the appeal. At the outset of this appeal, this court asked Ms. Williams, what imminent danger are you in? She made six filings to this court. And in not one of those filings did she make any allegation that would connect any conduct of the defendants to those dangers. In her complaint, she alleged two things that the defendants did. They put the R suffix on her record, which, by the way, is re-evaluated every time an inmate is transferred. So she's been transferred three times since then. So if she still has an R suffix, it's not because of anything that happened at RJ Donovan Prison. Second, she alleged that the defendants failed to protect her when a non-defendant officer told other inmates at RJ Donovan that she was a sex offender. Nowhere in the complaint does she allege that the defendants started rumors about her or talked about her, did anything, took any action that could have had any impact outside the confines of RJ Donovan. Now, if you compare that to the allegations of danger that she made at the outset of this appeal, they're unrelated. She alleged rape at California State Prison, Sacramento, by prison officials, rape, poisoning, separating her from her fiance, name calling, taking her property. And not once in six filings to this court did she say that the defendants directed those actions or even complained. Counsel, let me ask, what are we to do with the assertion that there's a continuing effect resulting from the past practice? Right. Ms. Williams has actually rebutted that presumption by her own allegations. The court said that the ongoing danger presumption is a presumption of the ongoing danger of what was alleged in the district court. At the outset of this appeal, alleging dangers that are unrelated to those and connect the defendants in no way to those dangers, Ms. Williams herself has rebutted that presumption. She has failed to meet this court's criteria for applying the imminent danger exception. She's shown no conduct at California State Prison, Sacramento, that arises out of the conduct of the defendants, or that's clearly related to the initial complaint, which this court required. And it's significant, too, that if she were successful on the merits of this case, it would not alleviate those dangers. She couldn't get an injunction or damages because those individuals aren't parties to the case. But the only issue here is, on this first issue, the question is whether she's entitled to IFP status, right? Exactly. And that's important because this court made clear in its previous decision that it's not in a position to conduct an overly detailed analysis of that issue. Mr. McGowan was right. The court said that it's an administrative decision. Ms. Williams wants you to go rifling through the record for other allegations and other pleadings, even pleadings at the district court, to find something that would connect her allegations to the defendants. But this court shouldn't have to do that. What they should do, the better practice is, what you should do is exactly what the court said it would do in its previous decision, which is evaluate the facial allegations that are made at the outset of the appeal. We do need to move on to exhaustion, but if I could just ask whether the information about an R designation in a file at one prison does or does not go, even if it's re-evaluated, does it not go to the second prison? Does the file not go with that R designation? Is that in the record somewhere that we could look at? That's in the regulation. It's Title 15, Section 3377. Each institution, upon transfer of the inmate, re-evaluates the classification. Would the file with the R go there so that they would know that a prior prison had put an R there? That's my question, whether that's in the record. Yes, Your Honor. That would be, actually it's not in the record, but that information would be in the inmate's history. But it's evaluated at the time of the transfer and based on information that's provided by the convicting court. So this court should also affirm the summary judgment because Ms. Williams failed to exhaust. Could you answer the question that we were struggling with with your opponent here about what would happen if we were to find that the court was wrong in granting summary judgment for the defendant on exhaustion? What would we do? Would we grant summary judgment for the plaintiff? Would there be an evidentiary hearing at the court below? Would it be subsumed with trial issues and tried to a jury in the court below, or what? I believe that it would probably go back to the district court to hold an albino evidentiary hearing to determine that issue and then proceed from there. Ms. Williams did not exhaust. And our position is that it's clear and undisputed on the record that even if you accept her allegation that Officer Cobb just wrongfully refused to process her grievance, she still had avenues of recourse available to her that she didn't take. She could have resubmitted the appeal with showing that it was wrongfully not processed, or she could have filed a separate grievance complaining about the failure to process. Or there's also a provision in the regulations that allows the third-level reviewer to determine that it can take a grievance for review even if it was wrongfully rejected below. Those were available to her. The third-level reviewer isn't the warden? No, it's not. It's someone at the headquarters of CDCR. So counsel, in the district court's holding, it said that Williams' statement that she was thwarted from filing a grievance and appeal met her burden of production under albino. Doesn't law of the case suggest that we have to recognize that and that it was inappropriate to grant the summary judgment? The law of the case would have been a determination of the legal issue. And the legal question before this court is, did, under albino, did the defendants come forward with evidence to meet their burden of showing that avenues were available that she did not take? They did, and she didn't refuse that evidence. What she did instead was admit that she didn't take those avenues. And because she submitted the mail, the grievance actually, to the warden and asked him to give it to the appeals coordinator. That's not a proper way to exhaust. Now, any concern that requiring an inmate to follow those alternative means of exhaustion is unfounded because those alternative means are there to assist the inmate. Theoretically, a failure to process a grievance could happen for any number of reasons. It could be wrongful, intentional, or it could just be a mistake. Something could have fallen through the cracks. Either way, those alternative methods give the inmate the assistance of a way to get that cleared up. Either way, if it was a mistake and fell through the cracks, those alternative means give the inmate a way to get that mistake cleared up and move on, get the issue resolved. How many alternative means does the case law require an inmate to follow? Well, first of all, none if the inmate comes forward with some evidence to support the claim that the grievance was wrongfully not processed. Here, for example, Ms. Williams claims that she kept copies of everything she submitted to everybody. And the district court gave her additional opportunities, even beyond what the rules require, to submit that evidence to support her claim. If she had done that, she might have been able to build her case and been excused from exhaustion. She didn't ever present that evidence to the court. But even if an inmate doesn't have that evidence, those alternative means help them build a record. If it happens again, then they've got a record and they can be excused. I'm just wondering if there's any authority to tell us that multiple alternative means must be followed, and if so, how many of them must be, et cetera. I'm not aware of any that say how many, but what we do have is the United States Supreme Court's decision saying that to properly exhaust, an inmate must follow the procedures that are outlined for exhaustion in the prison's regulations. Those procedures are there, and they're there to help the inmate. And Ms. Williams didn't avail herself of those and failed to exhaust. So this court should affirm the summary judgment. Thank you very much, counsel. Rebuttal? Rebuttal. OK, on the issue of imminent danger, counsel argues that there was no connection, not a sufficient connection, between the violation in the complaint and the imminent danger. However, there's repeated instances of Ms. Williams saying, alleging that she's under attack, and these people are attacking her because they know she's designated with the R suffix. I think the record does support the imminent danger finding. On the issue of exhaustion, I think the law of the case doctrine does apply, especially to that very concise finding by the Williams I court that said that Ms. Williams met her burden of production on the issue of showing that administrative remedies were not available. I don't think this court can make a contrary finding without violating the doctrine on that issue, because the facts are the same. Unless it's clearly errant, clearly wrong, I think this court has to stay with that finding. And it also makes sense, because Ms. Williams did follow the right procedure. She filed. It was rejected at the first step. It's like, where do you go from there? There's really nowhere to go from there if you're denied access at the very beginning of the process. Thank you very much, counsel, for your argument. This case is now submitted. Thank you.
judges: O'scannlain, Owens, Wilken